UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANET M. CORDTS,

                Plaintiff,                    Case Number 18-13017

v.                                             Honorable David M. Lawson

DUANE GRIFFIS, HURON CHARTER
TOWNSHIP, JACK BUSH, and BUSH
& SON GRADING & EXCAVATING, INC.,

                Defendants,

and

JACK BUSH, and BUSH & SON
GRADING & EXCAVATING, INC.,

                Defendants/Cross-Plaintiffs,

v.

HURON CHARTER TOWNSHIP

                Defendant/Cross-Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT AND AMENDING CASE MANAGEMENT AND SCHEDULING ORDER

Janet Cordts owns property on Otter Road in Huron Township, Michigan, on which sat a rundown house. She filed this lawsuit against the Township and its city attorney, a police officer, and an excavation contractor after the house was condemned and demolished. Cordts alleges that the Township did not follow proper procedures to give her notice of the impending demolition and retaliated against her when she complained about it. She says the contractor gleefully inflicted emotional distress when she showed up at the property on demolition day attempting to forestall

the destruction of the house and recover keepsakes and personal property. And she contends that the police officer violated her constitutional rights during the process.

Cordts's lengthy complaint contains a variety of federal and state law theories for recovery, at least two of which, she believes, entitles her to some relief as a matter of law. The defendants raise certain immunity defenses and contend that under the facts turned up through discovery — including evidence that Cordts had actual knowledge of the impending demolition — all of Cordts's claims must fail. Both sides filed motions for summary judgment to enforce those positions, and there is merit to some of the arguments on each side. But because genuine fact issues exist, neither side can prevail in full at this stage of the case. Therefore, the Court will grant in part and deny in part the cross motions for summary judgment.

I. Facts
A. The Property

Janet Cordts's property is located at 21525 Otter Road, New Boston, Michigan. In 1990, the plaintiff's mother-in-law conveyed the parcel to the plaintiff and her then-husband, Franklin Cordts, as joint tenants, and they recorded the deed with the Wayne County Recorder of Deeds. Since that time, the plaintiff and her husband divorced, and Franklin Cordts conveyed his interest to the plaintiff via an unrecorded quitclaim deed in 2011. The plaintiff did not record the deed until after the house was torn down in August 2015. However, she testified that she personally went to the Township office on several occasions after 2011 to furnish a copy of the deed and change the address for tax bills.

Around 2011, the plaintiff stopped living at the house because she accepted a 24-hour-per-day live-in caregiver position for an elderly couple in West Bloomfield, Michigan. Although the plaintiff no longer lived at the home, she said she used it as a "home base" while she lived with the elderly couple. However, the vacant house deteriorated rapidly. The water was cut off in 2011,

part of the roof collapsed, the house was missing shingles, the doors did not lock, the outside was overgrown with wild vegetation, the front door area smelled like urine, children played inside, and neighbors complained about its unsafe condition. Nonetheless, the plaintiff testified that she paid the property taxes from bills in Franklin's name that came to her at her West Bloomfield address.

Throughout 2013, the plaintiff says she went to the Township hall over 30 times attempting to get building permits to fix the property. She never succeeded at reaching the building department officials, so she mailed two letters to the building department: one on May 23, 2014, and another on June 7, 2014. The May letter outlined repairs she wanted to make to the driveway, and the June letter indicated that she planned to install a new roof, but that she may need to demolish the structure if the repairs were too costly. Both letters asked for a response directed to her at her West Bloomfield address. But Huron Township never responded. Without a permit to fix the structure, the plaintiff tarped the roof and then left town, travelling with the couple she cared for to their home in Florida, as she had done every year.

B. Huron Township's Blight and Dangerous Building Ordinances

Eventually, Huron Township condemned the building under its dangerous building and blight enforcement ordinances in 2014. Each ordinance serves a separate purpose. The dangerous building ordinance requires the building inspector to respond to complaints about buildings that are "dangerous," "unsafe structurally" or a "fire hazard" by inspecting the offending structure and docketing a report with the Township that describes the structure's condition, its use, and the damages. Dangerous Building Ordinance § 159-4(A). If the inspector finds the building in a dangerous condition, he must issue a hearing notice to the owner or occupant. But if the name of the owner is not known, the inspector must look to "the last tax assessment records," and send the

notice there. *Id.* § 159-4(A)-(B). This procedure mirrors state law requirements. *See* Mich. Comp. Laws § 125.540.

The notice will announce that a hearing will take place before a hearing officer, giving the time and place, and telling the property owner that she "shall have the opportunity" to show cause why the hearing officer should not order the building or structure to be demolished, otherwise made safe, or properly maintained. *Id.* § 159-4(C).

The notice, of course, must be in writing and served personally or by mail at least 10 days before the hearing. If mailing is the method, it must be certified with a return receipt requested, and it must be addressed to "the owner or party in interest at the address shown on the tax records." *Id.* § 159-4(E). It also must be posted on "a conspicuous part" of the property. *Ibid.* If the hearing is held and the property owner does not show up, the hearing officer's findings and order must be served in the same way. *Id.* § 159-4(C).

After at least 30 days, the Township Board must hold a second hearing to review the hearing officer's findings. The Township must notify the owner in the same manner. *Id.* § 159-5(D). At that hearing, the owner must be given a chance "to show cause why the order should not be enforced." *Ibid.* After the Township Board makes its decision, the property owner has 20 days to appeal the decision to a Michigan circuit court by filing a petition for an order of superintending control. *Id.* § 159-6.

Huron Township's blight ordinance outlines a slightly different procedure for dealing with owners of blighted property. First, the owner and occupant is given notice to remove the blighted condition within two days. The notice must be served personally if that is "practical." If not, it may be mailed using certified mail; posting is required with this option. If the owner responds and asks for more time to address the condition, it may be granted. Blight Ordinance § 152-4(B).

Next, if the owner fails to remediate the blight or otherwise comply with the requirements set forth in the notice, the Township may seek either "abatement action in the 3rd Circuit Court of Michigan, and/or an appearance ticket action in the 34th District Court of Michigan." *Ibid.*

## C.  Huron Township's Inspection of the Plaintiff's Property

Between 2013 and 2014, Huron Township received complaints from neighbors about the dilapidated condition of the house on Cordts's property.  In the summer of 2014, Huron Township conducted two inspections of the property under its dangerous building ordinance.  First, Jonathan Tackett, Huron Township's building inspector, entered the property, circled the house, and viewed the property on all sides.  Then, Ralph Pasola, Huron Township's zoning administrator and blight enforcement officer, circled the property, peeked his head inside, and took photographs.  Neither Tackett nor Pasola received the plaintiff's consent to enter her property, nor did they obtain a warrant for the inspections.  At his deposition, Pasola acknowledged that his legal authority for entering the house amounted to "nothing."  Pasola Dep, ECF No. 37-13, PageID.1142.

Tackett could not recall the date of his inspection, but he believed it preceded Pasola's inspection, which occurred on July 8, 2014.  Tackett also testified that his inspection was the only time he entered the property until the demolition and that he posted a sticker on the exterior of the home stating that it was a dangerous building.  That "sticker" did not fulfill the dangerous buildings ordinance's requirement, as it did not include the location or time of any hearing.

## D.  Huron Township's Hearing and Notice Attempts

Following Tackett's inspection, Huron Township scheduled a hearing under its dangerous building ordinance.  To ascertain the individual who owned the property, the Township looked at the county property tax records, which identified only Franklin Cordts as the owner.  However, a "Summer/Winter Tax Bill Information" document for 2013 lists Janet Cordts as the owner and

specifies her West Bloomfield address. No township employee took any additional steps before the demolition to determine the identity of interested persons in the parcel that were not on the tax records.

Cara Laurain, Huron Township's operations manager, sent a notice of the hearing to Mr. Cordts' then-current address on Otto Court in New Boston, Michigan, through first-class mail. The return receipt in the record appears to contain a signature for Franklin Cordts, but the date of the signature is not apparent, and the notice is festooned with "return to sender" legends. Pasola and Laurain both testified that they also called Franklin Cordts, who told them that he wanted nothing to do with the property. Franklin Cordts, however, never testified to that conversation.

The record is unclear on whether the Township complied with the posting requirement. A Huron Township document produced in discovery indicated that Laurain posted the notice, but she testified at her deposition that she did never did so. She stated that she believed Tackett posted the notice, but he denied doing so as well. Tackett testified that he was only on the property once before the demolition, and that the notice he posted had no information regarding a hearing. Likewise, Pasola did not post any notice on the property.

Huron Township held the dangerous building hearing on September 18, 2014. The plaintiff did not appear at the hearing, and the hearing officer ordered the building demolished within 21 days, and "all blight to be removed" from the property. Laurain, Tackett, and Pasola each testified that they did not send a notice of the hearing results too anyone or post them on the property.

E.  Pre-Demolition Activity

In April 2015, the full Township Board ratified the hearing officer's decision and gave the owners 90 days to remove any personal items. Huron Township then bid out and scheduled the demolition to occur on August 19-20, 2015.  Defendant Bush & Son was the successful bidder.

The Township then agreed that Bush & Son would demolish all buildings on the property, then clear the area of debris. However, neither party has located a signed copy of the demolition contract.

Laurain told Bush & Son that Huron Township properly condemned the property and that Bush & Son could legally demolish it. She also told Bush & Son that they had the authority to enter the premises and complete the contracted-for work. David Glaab, the Township executive, also confirmed Bush & Son's authority to demolish the structures on the condemned property and clear the area. When Bush & Son accepted the bid, the Township granted the company a permit to demolish the structures.

Shortly after receiving the permit on July 28, 2015, Jack Bush entered the property for an inspection, which, he testified, consisted of looking through the window and circling the property. But the plaintiff testified that Bush and zoning officer Ralph Pasola entered the property, cut tarps from the roof, and removed property from the house.

The plaintiff returned from her Florida trip in July 2015. When she visited her property with her friend, the house was undisturbed. But a few days later, the plaintiff noticed that the tarps were falling off and were slashed as if by a razor blade. The locks to the home were broken, the door was open, a trailer was moved, and another trailer with building materials was gone along with boxes from the shed. The plaintiff filed a report with the Huron Township police.

The plaintiff maintained that she had no notice of the condemnation or the impending demolition until the day it occurred. But her best friend of nearly 20 years, Joanne Manley, testified that before the demolition, the plaintiff told her that the house had been condemned, that it "was coming down," and that Huron Township was "going to demo her house." Additionally, on August 7, 2015 — about two weeks before the demolition — the plaintiff reported the suspected

theft at her house and told a Huron Township police officer that "she was aware that Huron Township had condemned the house." Police Report, ECF No.35-4, PageID.875.

### F. The Demolition

On August 18, 2015, defendant Jack Bush, the owner of Bush & Sons Grading & Excavating, Inc., went to the property to drop off an excavator to be used for the demolition. Bush returned the next day, intending to begin the demolition, but the plaintiff was at the scene and had an altercation with him. The plaintiff asked if he had removed property and cut the locks, to which he alleged replied by laughing and stating that "it's all mine." The plaintiff says she attempted to show Bush her proof of title, but he became enraged, and according to the plaintiff, chased her and her friend, while screaming and calling them "motherf*cking c*nt," "b*tch," and "a**hole." Cordts Dep., ECF No.46-2, at PageID.1952, 1959. The plaintiff claimed to have sprained her ankle fleeing from the defendant.

Bush called the Township, and the plaintiff called the police. When officer Duane Griffis arrived, he called Huron Township and confirmed that the Township condemned the property and authorized Bush & Son to demolish the structures. After receiving the information, Officer Griffis told the plaintiff she had to leave her property. The plaintiff asked if she could retrieve a box of pictures that she placed on the porch that contained the only two photos of her daughter who died when she was two days old. Officer Griffis refused and repeatedly instructed her not to interfere with the demolition.

The plaintiff continued protesting, and Officer Griffis suggested she contact Huron Township's attorney, Kevin Foley. The plaintiff pleaded for the crew to hold off the demolition until she returned from the Township Hall, and Griffis agreed. Officer Griffis then escorted the plaintiff to the Township hall, but no one provided any documentation validating the

condemnation.  When they returned to the house, Bush had started demolishing the front porch, where the photos were located.  The plaintiff asked Officer Griffis to let her go on the property and look in the dump truck to find the photos, but he refused.  The plaintiff never retrieved the photos.

The next day, the plaintiff and her best friend, Joanne Manley, returned to the property and confronted zoning officer Pasola and Bush, who were on the property.  According to Manley, Bush responded that the property was all his and slung profanities at the two women.  The plaintiff and Manley returned to the Township Hall again and met with Township Supervisor David Glab, Zoning Officer Pasola, and Operations Manager Laurain.  For the first time, the Township ran a title search on the property and discovered that the plaintiff was indeed an owner.  While Bush & Son completed the work, the plaintiff requested that the outhouse (a small shed filled with personal items) and some trailers be left, along with some construction materials at the property.  The Township agreed and modified the scope of the demolition work to accommodate the plaintiff's request.

The plaintiff and Manley returned to the property and observed that a trailer was crushed, culverts were missing, and some bricks were removed.  Bush admitted that he damaged a pop-up trailer while moving it to get into the house.  The plaintiff complained to Officer Griffis, but he took no further action.

## G.  Post-Demolition Activity

After the structure was demolished, Zoning officer Pasola sent a letter notifying the plaintiff of blight on her property, including the presence of three trailers and various building materials, which ultimately resulted in the issuance of two misdemeanor tickets on September 23, 2015.  The plaintiff then submitted two Freedom of Information Act (FOIA) requests in October

2015.  Pasola inspected the premises again on October 15, 2015, February 22, 2016, August 8, 2016, January 3, 2017, and January 11, 2017, to ensure compliance.

The plaintiff had not cut the grass on the property, she acknowledged, since the fall of 2015.  Huron Township sent the plaintiff notice of a noxious weed violation to the address she provided to the Township after the demolition.  But the plaintiff still did not mow the grass, so Huron Township arranged to mow the lawn and charged the plaintiff a 20% administrative fee for its expenses.

## H. The Complaint

On August 17, 2018, the plaintiff filed her lawsuit in the Wayne County, Michigan circuit court against the Township, Kevin Foley, Duane Griffis, Bush & Son, and Jack Bush.  The Township and Griffis removed the case to this Court.  The complaint pleads fifteen counts: inverse condemnation/taking without just compensation under Article X, section 2 of the Michigan constitution (Count I) and the Fifth Amendment (Count II) against Huron Township; Deprivation of property without due process under the Fourteenth Amendment (Count III), retaliation in violation of the First Amendment and the Michigan constitution (Count IV), unlawful property seizure under the Fourth Amendment (Count V), and denial of equal protection of law (Count VI) against all defendants; trespass (Count VII), trespass to chattels (Count VIII), statutory and common law conversion (Count IX), replevin/claim and delivery (Count X), and unjust enrichment (Count XI) against Bush & Son and Jack Bush; negligence/gross negligence (Count XII), intentional infliction of emotional distress (Count XIII), and negligent infliction of emotional distress (Count XIV) against all defendants; and violation of Michigan's Headlee Amendment (Count XV) against Huron Township.

The parties agreed to dismiss Kevin Foley from the lawsuit. After discovery concluded, the plaintiff moved for partial summary judgment on Counts III and V of her complaint. All defendants moved for summary judgment of dismissal on all the claims against them.

## II. Discussion

The fact that the parties have filed cross motions does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in

dispute. *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for" that party. *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## A. Takings Claims

The plaintiff contends that when the Township demolished her house, it took her property without just compensation in violation of the state and federal constitutions. (Counts I and II). The success of these claims stands or falls on the adequacy of the Township's pre-demolition notice to the plaintiff.

The Fifth Amendment prohibits governments from taking private property "for public use without just compensation." U.S. Const. amend. V; *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226 (1897) (applying the Takings Clause to the states through the Fourteenth Amendment). The Michigan constitution contains a similar prohibition, *see* Mich. Const. 1963, art. 10, § 2, and Michigan courts interpret this provision as coextensive with federal law, *Peterman v. State Dep't*

*of Nat. Res.*, 446 Mich. 177, 184 n.10, 521 N.W.2d 499, 504 n.10 (1994).  Land use regulations that result in a permanent, physical invasion of private property amount to a taking within the meaning of the Takings Clause.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982).

However, a government does not run afoul of the Clause when it exercises its police power to abate a public nuisance, since "'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.'"  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491-92 (1987) (quoting *Mugler v. Kansas,* 123 U.S. 623, 665 (1887)).  The source of this rule is the recognition that the State may make explicit those prohibitions on land uses that traditionally have been unlawful under "'existing rules or understandings that stem from an independent source such as state law.'"  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992) (quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972)).  Put differently, "the Takings Clause does not require compensation when an owner is barred from putting land to a use that is proscribed by those 'existing rules or understandings.'"  *Ibid.*  Laws abating public nuisances, which "involve[] the unreasonable interference with a right common to all members of the general public," *Sholberg v. Truman*, 496 Mich. 1, 6, 852 N.W.2d 89, 92 (2014), is one of those "understandings."

The Sixth Circuit has acknowledged that "[d]emolition . . . in order to enforce building codes or abate a public nuisance does not constitute a taking."  *Davet v. City of Cleveland*, 456 F.3d 549, 554 (6th Cir. 2006).  But the demolition must be "compliant with local law and procedure."  *Ibid.*  That procedure requires proper notice and a valid means of determining that the property in fact was a public nuisance.

As discussed below, the record does not conclusively establish either item. Material fact issues surround the question whether the Township complied with its own rules for providing notice of the condemnation and demolition hearings. And although there is plenty of evidence that the house on Cordts's property was a dangerous building and a public nuisance, Cordts has evidence of her own that the structure was salvageable and that she attempted to obtain a permit from the Township to repair the roof.

The Township held a hearing, made the determination that Cordts's house was dangerous, and condemned it. That finding could be preclusive. *See Davet*, 456 F.3d at 552. "[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliott,* 478 U.S. 788, 799 (1986) (cleaned up). Michigan courts grant preclusive effect to administrative decisions that are adjudicatory in nature. *Nummer v. Treasury Dep't*, 448 Mich. 534, 542, 533 N.W.2d 250, 253 (1995). But as with its federal counterpart, the rule includes the condition that "the same parties have previously had a full and fair opportunity to adjudicate their claims." *Id.* at 541, 533 N.W.2d at 253 (citing *Storey v. Meijer, Inc.,* 431 Mich. 368, 372, 429 N.W.2d 169 (1988)). If the notice given Cordts was inadequate, the Township's condemnation decision will not foreclose the plaintiff's claims here.

The Township argues that all of the plaintiff's claims based on the Michigan constitution must fail because state law does not recognize a free-standing claim based solely on the state constitution. The plaintiff's federal constitutional claims are not vulnerable to that argument, since 42 U.S.C. § 1983 provides the means for the plaintiff to recover damages for violations of the federal Constitution. *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990) ("Section 1983

. . . creates a right of action for the vindication of constitutional guarantees found elsewhere."). In *Jones v. Powell*, 462 Mich. 329, 335, 612 N.W.2d 423, 426 (2000), the Michigan Supreme Court held that the Michigan constitution does not "infer" a damage remedy "in an action against a municipality" where other remedies are available. But that does not seem to apply to actions for inverse condemnation against municipalities under Article 2, section 10 of the Michigan constitution. *See Mays v. Snyder*, 323 Mich. App. 1, 80, 916 N.W.2d 227, 272 (2018), *appeal granted sub nom. Mays v. Governor of Michigan*, 503 Mich. 1030, 926 N.W.2d 803 (2019). The remedy for such a claim, though, is not general damages but rather just compensation. *Peterman,* 446 Mich. at 206-207, 521 N.W.2d at 514.

Because questions remain on this record whether the Township followed the correct procedure and gave adequate notice before demolishing the plaintiff's house, summary judgment on Counts I and II cannot be granted.

### B. Procedural Due Process Claims

Although stated in Count III of the complaint, the main focus of the plaintiff's grievance against the Township is that she was not given proper notice of condemnation or demolition proceedings and therefore was deprived of her property without due process of law. Both sides argue that they are entitled to judgment as a matter of law on this count, but fact issues undermine each party's position.

In order to establish a procedural due process violation, the plaintiff must show that (1) she has a life, liberty, or property interest protected by the Constitution; (2) she was deprived of that interest by a state actor; and (3) she was not afforded timely and adequate process under the law. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009). No one disputes Cordts's property interest in her house and its contents, and no one suggests that there was no deprivation. The

question is, was Cordts given timely and adequate process? The record does not answer that question conclusively.

A fundament of due process is notice and the opportunity to be heard. *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). The notice must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and "must afford a reasonable time for those interested to make their appearance." *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 314 (1950). Whatever device the local government chooses to give notice, it must after all be "through means that 'one desirous of actually informing the absentee might reasonably adopt.'" *Ming Kuo Yang v. City of Wyoming, Michigan*, 793 F.3d 599, 602 (6th Cir. 2015) (quoting *Mullane*, 339 U.S. at 315). And when the chosen method fails, "it must take 'additional reasonable steps' to notify the interested party." *Id.* at 603 (citing *Jones v. Flowers*, 547 U.S. 220, 234 (2006)).

The Township maintains that it followed the notice protocol in its dangerous building ordinance, and, even though that prescribed route took them to Franklin Cordts, who no longer had an interest in the property, that is all that was required. There are several reasons why that argument does not hold up.

First, the record is far from clear that the Township complied with all the ordinance's requirements. The notice provision clearly expresses a preference for personal service. It allows for a mailing/posting option only "[i]f the name of the owner . . . is not known." The record is replete with evidence that Janet Cordts had an interest in the property. She was listed as a joint tenant in the most recently recorded deed in 1990 and would have been found had the Township undertaken any rudimentary action to locate the owner. *John Widdicomb Co. v. Card*, 218 Mich. 72, 75-76, 187 N.W. 308, 309 (1922) ("That the record of a deed or mortgage by the holder of an

equitable title in possession is constructive notice to a subsequent purchaser from the common grantor is the Michigan rule.").  She also sent letters and notices to the building department, complete with her West Bloomfield address, when she tried to get permission to repair the roof. The Township asserts that there is no evidence of the plaintiff's contacts, but the plaintiff's own testimony suffices to create a fact question on that proposition.  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012) (citing *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 893-94 (5th Cir. 1980)).  She also testified that she contacted the Township at least twelve times to notify it that its tax records should be changed.  In a condemnation case, the Due Process Clause requires the municipality to provide actual notice to an individual whose "name and address were readily ascertainable from both deed records and tax rolls."  *Schroeder v. New York*, 371 U.S. 208, 210 (1962).

Second, when the Township elected to use mailing as a method for serving notice, its ordinance required that it also post on the property (1) the hearing notice and (2) the results of the condemnation and demolition hearings.  The evidence of posting the hearing notice is inconclusive, and the evidence of posting the results of the hearings is nonexistent.  Because those steps were omitted, a jury could conclude that the Township's method of notification was not "reasonably calculated, under all of the circumstances," to inform the plaintiff of the Township's intentions as to her property.

The Township's fallback position is that regardless of the adequacy of the efforts to notify Cordts of the condemnation and impending demolition, she had actual knowledge of what was to come.  That may be enough.  *See Hroch v. Omaha*, 4 F.3d 693, 696 (8th Cir. 1993) ("Because [the plaintiff] had actual notice that the City intended to condemn all buildings on the premises, there was no procedural due process violation"); *Roberts v. Girder*, 237 F.Supp.3d 548, 555 (E.D. Ky.

2017) ("due process may be satisfied by actual notice of the decision to demolish the property and the consequences for failure to timely challenge the determination").

But the record does not establish that fact conclusively, either. There are statements in a police report that when the plaintiff called the police on August 7, 2015, to report that property was missing from her house, she informed the responding officer that she was aware the property had been condemned. And Officer Griffis testified that the plaintiff told him on the date of the demolition that she was aware of the proceeding and demolition. Also, the plaintiff's friend, JoAnne Manley, admitted during her deposition that the plaintiff knew about the demolition, but that the plaintiff felt that it was not going to happen.

But the plaintiff disputes these allegations. She insists that she had no prior knowledge of the condemnation or demolition proceedings until the day of the demolition. Her daughter, Tiffany, testified to the same. Tiffany stated that they were aware that the Township sent blight notices, but they believed that it only related to grass or tree regulations. They maintained that they had no idea that Huron Township planned to demolish the structure until they encountered Jack Bush on the morning of the demolition.

Whether the plaintiff had actual notice of the upcoming demolition is unsettled. Likewise unsettled is the question whether she knew of the hearings in advance in sufficient time to present a defense. A jury must decide that question. Neither side is entitled to summary judgment on the due process claim (Count III).

## C. First Amendment Claim

The plaintiff contends that Huron Township retaliated against her by issuing blight notices for exercising her First Amendment rights, namely, submitting two FOIA requests in October 2015. (Count IV). She also invokes the Michigan constitution.

It is generally accepted that a plaintiff bringing a First Amendment retaliation claim via 42 U.S.C. § 1983 must satisfy three elements: "'(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

The Township contends that Cordts cannot satisfy the causation element because the protected conduct post-dated the alleged adverse action. The Court agrees.

The Sixth Circuit has analyzed causation in two steps: first looking to see if the protected conduct "proximately caused" the adverse action, and then determining if the defendant's motive was "'to punish [the plaintiff] for the exercise of a constitutional right.'" *Paterek*, 801 F.3d 630, 646 (6th Cir. 2015) (quoting *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012)). Cordts offers evidence addressing the second step: that Township officials singled out her property for special attention; that she was treated differently than other homeowners; that Township Operations Manager Cara Laurain reminded Zoning Officer Pasola that "today was the day" they ticket the plaintiff; and that she later allegedly told Pasola "most sh*tty homes are owned by sh*tty people." But Cordts has not offered evidence to satisfy the first step.

The supposed retaliation — issuing blight tickets — took place on September 23, 2015. But Cordts did not submit her first FOIA request until October 9, 2015. "Retaliation" occurring before the protected conduct could not have been motivated by it. *See Wolgast v. Tawas Police Auth.*, 2006 WL 2583228 (E.D. Mich. Sept. 7, 2006) (finding that since the "[p]laintiff's FOIA request was made after the officers were investigating the plaintiff, the investigation could not

have been motivated by the plaintiff's FOIA request."). At this stage of the case, the plaintiff is obliged to offer evidence that supports a triable fact issue on whether the plaintiff has been retaliated against "as a direct result of his or her protected speech." *Paterek*, 801 F.3d at 646. Because she has not done so, the Township is entitled to summary judgment on Count IV of the complaint.

### D. Fourth Amendment Claims

The plaintiff accuses the Township of illegal searches and seizures in three instances: pre-demolition inspections, the demolition, and post-demolition inspections. (Count V). The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. As a general rule, a warrantless search of a home or business is presumptively unreasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011). There is no evidence that the Township obtained a search warrant for any of its activity. But it defends the pre-demolition inspections by pointing to the ordinance section that authorizes building officials to inspect dangerous buildings. It justifies the demolition itself by the administrative order authorizing the removal of the building. And it argues that the post-demolition inspections of the property were not "searches" because after the house was taken down, the land became an "open field."

### 1. Pre-demolition Inspections

The plaintiff complains that the Township officials unlawfully search her property under its prevailing practice at the time when, in the summer of 2014, Building Inspector Jonathan Tackett, investigating neighbors' complaints, entered the parcel, circled the house, and viewed the property on all sides. Then, on July 8, 2014, Zoning Administrator and Blight Enforcement Officer Ralph Pasola circled the property, poked his head inside the house, and took photographs. Those actions constituted a "search" within the meaning of the Fourth Amendment. Township officials

"physically occupied private property for the purpose of obtaining information." *United States v. Jones*, 565 U.S. 400, 404 (2012). Tackett and Pasola trespassed upon the curtilage, and Pasola took a peek inside the dwelling to boot. In doing so, they penetrated the "potent shield" that the Fourth Amendment erects. *Jacob v. Twp. of W. Bloomfield*, 531 F.3d 385, 389 (6th Cir. 2008). The property was the plaintiff's family home. Although she did not live at the house any longer, she kept many of her personal belongings there and used the house as a "home base" while working elsewhere as a live-in caregiver. Accordingly, she had a "reasonable expectation of privacy" in that dwelling. "A warrantless search of the curtilage violates the Fourth Amendment unless an exception to the warrant requirement applies." *Watson v. Pearson*, 928 F.3d 507, 511 (6th Cir. 2019).

The Township's reliance on the inspection authorization in the ordinance to justify the township officials' entry on Cordts's property to investigate neighbor complaints puts the cart before the horse. An ordinance that authorizes warrantless inspections without proper safeguards is unconstitutional. *City of Los Angeles, California v. Patel*, --- U.S. ---, 135 S. Ct. 2443, 2451 (2015).

One exception to the warrant requirement focuses on a search "conducted for a 'special need' other than to investigate criminal wrongdoing." *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018). That includes "administrative searches designed to assure compliance with building codes, including codes designed to prevent buildings from becoming dangerous to tenants or neighbors." *Benjamin Trust v. Stemple*, 915 F.3d 1066, 1069 (6th Cir. 2019) (citing *Patel*, 135 S. Ct. at 2452; *Camara v. Mun. Court*, 387 U.S. 523, 534 (1967)). Under this administrative-search exception to the warrant requirement, some procedural demands are relaxed. But before a municipal official may "conduct[] a warrantless search of a building or property on

the ground that it has become dangerous, the government must give the owner 'an opportunity to obtain precompliance review before a neutral decisionmaker.'" *Ibid*. (citing *Patel*, 135 S. Ct. at 2452). Without the opportunity for precompliance review, there exists an "intolerable risk" that searches authorized by an ordinance will exceed statutory limits or be used as pretext to harass individuals. *Patel*, 135 S. Ct. at 2452-53.

There was no such opportunity here. The officials never notified the plaintiff, much less sought consent, before they entered the property and looked inside the house. There was no warrant (administrative or otherwise) and no emergency. Pasola even acknowledged that his legal authority to do what he did was "nothing." These facts are undisputed. The plaintiff is entitled to summary judgment on this part of Count V of her complaint.

## 2. The Demolition

The Township argues that it had the right to be on the property when the house was demolished. But it is the destruction of the house itself that the plaintiff posits as a violation of the Fourth Amendment's prohibition against unreasonable "seizures." A seizure occurs "when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109 (1984)). The demolition of a dwelling constitutes a seizure under the Fourth Amendment. *See Freeman v. City of Dallas*, 242 F.3d 642, 647-48 (5th Cir. 2001) (en banc).

It is true that warrantless seizures can be unreasonable, but the "remedial order" entered by the hearing officer serves as the functional equivalent of a warrant to authorize the demolition. *Embassy Realty Invs., Inc. v. City of Cleveland*, 572 F. App'x 339, 345 (6th Cir. 2014) (citing cases). That is the sort of administrative warrant that the Supreme Court found to be reasonable for the purpose of verifying compliance with municipal health and safety codes. *See Camara*, 387

U.S. at 538; *See v. City of Seattle,* 387 U.S. 541, 544-45 (1967). As such, the order "need only satisfy standards of administrative reasonableness." *Freeman*, 242 F.3d at 650 (citing *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 320 (1978); *Griffin v. Wisconsin,* 483 U.S. 868, 877 n.4 (1987)). But once again, to be valid, those administrative procedures must afford the property owner an opportunity for precompliance review. *Patel*, 135 S. Ct. at 2452. Therefore, the validity of the demolition — the seizure — depends on whether Janet Cordts received proper notice of the condemnation and the demolition proceedings.

Because fact issues are yet to be resolved on that question, neither side is entitled to summary judgment on this part of Count V of the complaint

### 3. Post-Demolition Inspections

After the Township demolished the house, Zoning Officer Pasola sent a letter to the plaintiff notifying her of blight on the property, including the presence of three trailers and various building materials, which ultimately resulted in the issuance of two misdemeanor tickets on September 23, 2015. Pasola inspected the property again on October 15, 2015, February 22, 2016, August 8, 2016, January 3, 2017, and January 11, 2017, to ensure compliance. No warrant was obtained, and the plaintiff says that these entries also violated the Fourth Amendment.

The Township says no search occurred on those occasions, because after the house was demolished the property became an "open field." *Oliver v. United States*, 466 U.S. 170, 177 (1984). The irony of this argument, of course, is that if the land became an "open field," it was only because the Township demolished the plaintiff's house. More to the point, the open fields exception was based on a textual reading of the Fourth Amendment, which applies to "persons" and "effects." Finding that land is not an effect, the Supreme Court found the Fourth Amendment inapplicable in *Oliver*. 466 U.S. at 177. But here, the plaintiff's land still had a number of "effects"

on the property, including building materials, outbuildings, and trailers. The presence of those "effects" resists characterizing the land as an open field. Under "the seldom used 'property-based' approach to the Fourth Amendment search inquiry," *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019), the entry onto the plaintiff's land to photograph the "effects" that, in the Township's view, amounted to blight, constituted a "search in the constitutional sense." *See Jones*, 565 U.S. at 411 n.8.

The Township also invokes *Heck v. Humphrey*, 512 U.S. 477 (1994), reasoning that recognizing a Fourth Amendment violation here would undermine the validity of Cordts's misdemeanor blight convictions. *Heck* bars direct challenges to convictions through civil rights actions unless the conviction has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or otherwise has been called into question by a federal court's issuance of a writ of habeas corpus. 512 U.S. at 486-87. In civil rights cases attacking unlawful searches, *Heck* does not come into play unless the "contested search produced the *only* evidence supporting the conviction and no legal doctrine could save the evidence from exclusion." *Harper v. Jackson,* 293 F. App'x 389, 392 (6th Cir. 2008) (emphasis in original).

The record here does not disclose what evidence was used to support the misdemeanor blight convictions or if another legal theory — plain view, perhaps — would have saved the evidence. Because this is an open question, neither side is entitled to a judgment as a matter of law on this part of the plaintiff's claim in Count V.

### E. Equal Protection Claim

Contending that the Township treated her more severely than its other citizens, Cordts says that she was denied the equal protection of the laws. (Count VI). Several homes near hers were in worse condition, she says, but were not torn down or ticketed for blight.

Cordts does not contend that the Township's actions burdened any fundamental right; nor has she suggested that she is a member of a suspect class, or any class for that matter. But she need not plead class membership to sustain an equal protection claim, as the Supreme Court has recognized that the Equal Protection Clause applies as well to a "class of one." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). But she must point to evidence that she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Ibid.*

That is no easy task. "[T]here is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (citing *United States v. Armstrong,* 517 U.S. 456, 464 (1996)). And absent the deprivation of a fundamental right or membership in a suspect class, "[i]f there is any reasonably conceivable state of facts that could provide a rational basis for the state's conduct, then the state has not violated the constitution." *Systematic Recycling LLC v. City of Detroit*, 635 F. App'x 175, 181 (6th Cir. 2015) (citations and quotations marks omitted). In the Sixth Circuit, a class-of-one plaintiff may take one of two routes to show the absence of a rational basis: she can (1) "negate every conceivable basis which might support the government action': or (2) she can offer evidence that "demonstrat[es] that the challenged government action was motivated by animus or ill-will." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012) (quoting *Warren v. City of Athens,* 411 F.3d 697, 711 (6th Cir. 2005)).

The plaintiff has not offered evidence on either proposition. The record does not reflect that the Township singled out her house to demolish. The plaintiff's house was one of three or four properties that were up for a demolition hearing on the same date. And the Township offered

uncontradicted evidence that it consistently investigated and ticketed other blight in the Township. The Township had a complaint system by which it enforced blight conditions as neighbors reported them. Huron Township received numerous complaints from neighbors that the plaintiff's house was dangerous, smelly, dilapidated, and an attractive nuisance for neighborhood children. The plaintiff argued that she called Huron Township on her neighbor to report blight, and Huron Township did nothing. But there is nothing irrational in a system that "concentrate[s] limited resources on the most notorious or easy to locate violators." *Futernick v. Sumpter Twp.* 78 F.3d 1051, 1057 (6th Cir. 1996), *overruled on other grounds by Vill. of Willowbrook*, 528 U.S. at 564.

Nor is there any evidence that the Township's actions against the plaintiff's property were motivated by its ill will toward her. According to the plaintiff, the demolition took place before anyone in the Township office even knew that she was the owner of the property. And, as noted earlier, the blight tickets were issued well before Cordts embarked on her FOIA campaign to obtain records dealing with the demolition.

Because the facts in the record do not demonstrate a triable fact issue on this theory, summary judgment on Count VI will be granted.

## F. Headlee Amendment Claim

Because Cordts had not cut the grass on the property since the fall of 2015, the Township notified her under its Noxious Weed Ordinance, Twp. Ord. No. 76-2, *amended by* Ord. 07-02, that it would do it for her and send her a bill. It did just that, and in July 2018 it charged Cordts $193.62 for the job ($110.84 for labor, $77.77 for "J.D. 950," and $5.01 for weed whacking) and tacked on a 25% administrative fee of $48.40. Cordts contends that the administrative charge is an illegal tax under Michigan law. (Count XV).

Section 31, article 10 of the Michigan constitution, the so-called "Headlee Amendment," prohibits local governments from levying or increasing a tax unless it is approved by a vote of its citizens. Misunderstanding the nature of the assessment in this case, counsel for the Township says that the plaintiff was charged only 20% and that the Township forewent 80% of the actual cost of cutting the weeds. Therefore, he reasons, there was no revenue generated by this exercise.

The focus of Cordts's grievance is not the charge for the actual work done; it's the administrative surcharge. The Township did not forego any reimbursement for work performed; it charged the full amount. And it added 25% ($48.40 is 25% of $193.62) to cover it expense of scheduling, coordinating, and allocating Township personnel and equipment for the abatement. *See* Twp. Ord. 07-02 § 9 ("An administrative fee of 25% of the actual cost for the abatement of the nuisance shall be added to any costs charged by the Township to the property owner whenever the Township abates a nuisance under this Ordinance.").

Under Michigan law, a non-voter-approved "tax" is illegal, but a "fee" charged by a municipality for a service is not. *Bolt v. City of Lansing*, 459 Mich. 152, 159, 587 N.W.2d 264, 268 (1998). To tell the difference, Michigan courts balance three factors: (1) whether the charge "serve[s] a regulatory purpose rather than a revenue-raising purpose"; (2) whether the charge is "proportionate to the necessary costs of the service"; and (3) whether incurring the charge is "voluntary." *Id.* at 161-62, 587 N.W.2d at 269. Applying these factors, the administrative charge here fits the "fee," not the "tax," category.

The administrative add-on charge served a regulatory purpose because it was directed to property owners who failed to comply with the ordinance that required them to control the growth of grass and weeds on their property. The charge was to defray the expense of arranging for a contractor or township employee to schedule the work, arrange for equipment placement, and bill

the property owner. Compare the charge found illegal in *Bolt*, where a city assessed each property owner a "service charge" to cover the cost of a new storm sewer system, which the court found to be "an investment in infrastructure as opposed to a fee designed simply to defray the costs of a regulatory activity." *Id.* at 163, 587 N.W.2d at 270. The charge here was tied directly to the work performed.

The Township's administrative surcharge is proportionate to the actual cost of abatement. The entire purpose of the percentage-based approach is to help the city recover administrative costs that are difficult to calculate. It is reasonable to conclude, though, that for larger projects, more administrative time and effort would be required to set things in motion, monitor progress, and bill the responsible parties. It is not unusual for contractors in the private sector to allocate costs in that way.

And although the fee is involuntarily applied, it is voluntary in the sense that individuals can avoid it by cutting their grass and maintaining their property. Certainly, Cordts did not agree to pay an administrative fee, or any fee for that matter. But that does not mean that the administrative surcharge is an illegal tax. *See Bolt*, 459 Mich. at 180-81, 587 N.W.2d at 278 (noting that "our precedent does not establish that voluntariness somehow constitutes a determinative factor in considering a fee to be a tax. If this were the case, then other fees, such as 9–1–1 emergency charges, sewer charges, and recycling fees, would be open to attack"). Here, the plaintiff was able "to control the extent to which [she used] the service"; all she needed to do was mow her lawn. *Id.* at 167, 587 N.W.2d at 272.

Because the administrative charge was a fee and not a tax, it was not assessed illegally, and the Township is entitled to summary judgment on Count XV of the complaint.

G. State Law Claims Against the Township

Cordts also accused the Township of negligence and gross negligence (Count XII), and intentional (Count XIII) and negligent (Count XIV) infliction of emotional distress. The Township argues that those claims are barred by Michigan's Governmental Tort Liability Act (GTLA), Mich. Comp. Laws § 691.1407. The Court agrees.

Under the GTLA, a local unit of government generally is immune from tort liability if the government agency is engaged in the exercise or discharge of a governmental function. Mich. Comp. Laws § 691.1407(1). Enacting and enforcing ordinances has long been held to constitute a performance of a governmental function. *Central Advertising Co. v. City of Novi*, 91 Mich. App. 303, 313-14, 283 N.W.2d 730, 734 (1979).

The GTLA list several exceptions to this general rule. A local government can be held liable for its negligent or intentional conduct when it builds, designs or maintains public highways, Mich. Comp. Laws § 691.1402 engages in a proprietary function, Mich. Comp. Laws § 691.1413, provides medical care or treatment, Mich. Comp. Laws § 691.1407(4), operates a motor vehicle, Mich. Comp. Laws § 691.1405, operates or maintains a public building, Mich. Comp. Laws § 691.1406, or operates and maintains a sewage disposal system, Mich. Comp. Laws § 691.1417(2). Cordts does not invoke any of these.

Instead, Cordts contends that the Township cannot escape liability because its conduct amounted to gross negligence. The GTLA carves out an exception to the immunity of municipal employees whose conduct was grossly negligent. Mich. Comp. Laws § 691.1407(2)(c). Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a). That definition does not encompass

intentional conduct.  There is no intentional tort exception to governmental immunity.  *Bell v. Fox*, 206 Mich. App. 522, 525-26, 522 N.W.2d 869, 871 (1987).

The plaintiff does not develop her argument beyond citing the gross negligence exception. And the Court finds no evidence supporting the contention.   The Township certainly owed the plaintiff a duty of reasonable care when it sent notices to enforce its dangerous building and blight ordinances.  It is not difficult to conclude that it breached that duty by not checking its own records and the deed in the county records identifying Janet Cordts as having an interest in the property. But that is not "proof of conduct 'so reckless as to demonstrate a substantial lack of concern for whether an injury results.'"  *Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012) (citing *Maiden v. Rozwood*, 461 Mich. 109, 597 N.W.2d 817, 824 (1999)).  "Evidence of ordinary negligence is not enough to establish a material question of fact regarding whether a government employee was grossly negligent." *Chelsea Investment Group, LLC v. Chelsea*, 288 Mich. App. 239, 265; 792 N.W.2d 781 (2010).  The same goes for the Township itself.

Counts XII, XIII, and XIV against the Township will be dismissed.

### H.  Claims Against the Demolition Contractor
#### 1.  Federal Claims

The plaintiff seeks to hold Jack Bush and his company, Bush & Sons, liable for the due process, First Amendment, Fourth Amendment, and equal protection claims she brought against the Township.  She asserts those claims under 42 U.S.C. § 1983.  Therefore, she must prove "'(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'"  *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).  Bush argues that he is a private contractor, not a state actor, and therefore he cannot violate the plaintiff's federal constitutional rights.

For liability to attach under section 1983, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). That is because the Constitution protects citizens from infringement of their rights by the government, not by private parties. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978) (recognizing that "most rights secured by the Constitution are protected only against infringement by governments") (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974); *Civil Rights Cases*, 109 U.S. 3, 17-18 (1883)).

The evidence in this case plainly establishes that Bush & Sons is a private corporation and its employees are private actors as well. However, there are times when private parties may be deemed a state actor. And although the Supreme Court has acknowledged that its "cases deciding when private action might be deemed that of the state have not been a model of consistency," *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting), the exceptions tend to fall into two broad categories: the "public function exception," and the "entanglement exception." *See* Chemerinsky, *Constitutional Law* at 552 (3d ed. 2009).

Under the public function exception, a private actor can be held accountable for a constitutional violation when it exercises "powers traditionally exclusively reserved to the State." *Jackson,* 419 U.S. at 352. The Sixth Circuit has interpreted the public function category narrowly, noting only functions like holding elections, exercising eminent domain, and operating a company-owned town meet this test. *Chapman v. Higbee Co.*, 319 F.3d 825, 833–34 (6th Cir. 2003) (en banc). That category plays no role here.

Under the entanglement exception, a private entity may be found to be a state actor if the state has affirmatively authorized, encouraged, or facilitated the private unconstitutional conduct, or otherwise permitted a private actor to "exercise[] power 'possessed by virtue of state law and

made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins,* 487 U.S. 42, 49 (1988) (finding private physician under contract with state to provide medical services to prison inmates was a state actor) (quoting *United States v. Classic,* 313 U.S. 299, 326 (1941)). Within this exception, state action by private parties has been found when the executive or judicial arm of state government has provided assistance in perpetrating unconstitutional conduct. *See, e.g., Shelley v. Kraemer,* 334 U.S. 1 (1948) (state action found where private party resorted to state courts to enforce discriminatory private deed restrictions); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715 (1961) (finding state action based on the symbiotic relationship between restaurant and publicly-run parking facility leasing property to the restaurant); *North Ga. Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601 (1975) (using state courts and bailiffs to enforce creditor's remedies lacking in procedural due process).

Nonetheless, neither authorization of private conduct by law, *Flagg Bros.,* 436 U.S. at 164-65, nor restriction by licensure or regulation alone, *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163 (1972), will be sufficient to constitute state action. Instead, the Supreme Court has held that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982) (holding that decisions of physicians and administrators of privately owned and operated nursing homes to transfer Medicaid patients not state action); *see also Rendell–Baker v. Kohn,* 457 U.S. 830, 840 (1982) (employment discharge decisions of privately owned and operated school receiving nearly all revenue from state contracts not state action).

Perhaps most significant here, a private corporation whose business depends primarily on public contracts with the state does not become a state actor simply because of its "significant or

even total engagement in performing public contracts." *Rendell–Baker*, 457 U.S. at 840-41. Other courts have been reluctant to find state action where the only purported nexus between the state and a private actor is predicated on a mere contractual relationship. *See Partin v. Davis*, 675 F. App'x 575, 586-87 (6th Cir. 2017) (holding that a towing company that assisted police in a wrongful seizure of the plaintiff's tractor-trailer fell short of demonstrating a close enough nexus with the government to expose it to section 1983 liability); *Osler ex rel. Osler v. Huron Valley Ambulance Inc.*, 671 F. Supp. 2d 938, 945 (E.D. Mich. 2009) (private ambulance company with an exclusive county contract was not engaged in "state action" when the ambulance struck a pedestrian); *Cornett v. Mason Volunteer Fire Co.*, 1996 WL 242035 at *3-4 (6th Cir. 1996) (private firefighting company did not engage in state action despite being under contract with township to provide emergency fire services to local citizens).

There is no evidence in this record that supports a finding that the Bush defendants are state actors. Bush merely bid on the demolition contract well after the Township made its decision to demolish and remove the house. He performed his work according to the written agreement. He had no special authority to enter the property except the Township's contractual permission to perform the work. That falls far short of the "pervasive entwinement" that the plaintiff must demonstrate before state action can be found. *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 412 (6th Cir. 2006) (quoting *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 298-302 (2001)).

The Bush defendants' role in the demolition is insufficient to make them state actors. Therefore, the Court will grant their motion for summary judgment on Counts III through VI of the complaint.

## 2. State Law Claims
### a. Trespass

Cordts contends that Jack Bush's conduct on demolition day was a trespass upon her land. (Count VII). Trespass has been defined to be any unauthorized intrusion or invasion of the private premises or lands of another. *Giddings v. Rogalewski*, 192 Mich. 319, 158 N.W. 951 (1916); *Douglas v. Bergland*, 216 Mich. 380, 185 N.W. 819 (1921). To recover for trespass to land, a plaintiff must demonstrate "an unauthorized act direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Adams v. Cleveland-Cliffs Iron Co.*, 237 Mich. App. 51, 67, 602 N.W.2d 215, 222 (1999).

The Bush defendants say that they did nothing more than perform their contract and had no intention to interfere with the plaintiff's property rights. But for liability to attach, a trespasser need only intend to enter the land, not intend to interfere with a possessory interest. *Traver Lakes Cmty. Maint. Ass'n. v. Douglas Co.,* 224 Mich. App. 335, 345, 568 N.W.2d 847, 852 (1994).

The Bush defendants also argue that they were clothed with the Township's authority to demolish the house. Citing *Smith, Hinchman & Grylls Assocs., Inc. v. City of Riverview*, 55 Mich. App. 703, 706, 223 N.W.2d 314, 315 (1974), an agency case, they contend that they were authorized to do what they did to the structure. However, where the "legal authorization" upon which the agent relies is itself defective, it cannot stand as an excuse for a trespass. *Fruman v. City of Detroit*, 1 F. Supp. 2d 665, 675 (E.D. Mich. 1998). The viability of this defense for the Bush defendants will depend on whether the plaintiff had proper notice of the impending demolition. That cannot be resolved at the summary judgment stage of the case.

### b. Personal Property Claims

Cordts contends that Jack Bush came to the property sometime in early August 2015 and entered the house, removed some of her property, and cut the tarps protecting the damaged roof.

Based on that conduct, she brought claims against the Bush defendants for trespass to chattels, (Count VIII), statutory and common-law conversion (Count IX), replevin and claim and delivery (Count X), and unjust enrichment (Count XI). The Bush defendants respond that Cordts filed her complaint too late to assert those personal-property-based claims.

Michigan's statute of limitations for "injury to . . . property" is three years. Mich. Comp. Laws § 600.5805(2). The plaintiff filed her compliant in this case on August 17, 2018, which was outside the three-year window for property-based claims that accrued in "early August" 2015.

The plaintiff counters that Bush still has the property he stole from the house and land, so the tort continues "to this day." Citing *Blazer Foods, Inc. v. Rest. Properties, Inc.*, 259 Mich. App. 241, 246, 673 N.W.2d 805, 809 (2003), she says that "the continuing wrong doctrine" will save her tardy filing. But under that "doctrine," the plaintiff must show "'continual tortious *acts,* not by continual harmful effects from an original completed act.'" *Id.* at 246, 673 N.W.2d at 810 (quoting *Horvath v. Delida,* 213 Mich. App. 620, 627, 540 N.W.2d 760, 763 (1995). She has not done so. Moreover, later caselaw has cast the "continuing wrong doctrine" into doubt. *Marilyn Froling Revocable Living Tr. v. Bloomfield Hills Country Club*, 283 Mich. App. 264, 285, 769 N.W.2d 234, 247 (2009). Therefore, the property-based claims in Counts VIII through X will be dismissed as untimely.

The unjust enrichment claim is based in equity and therefore not subject to the three-year statute of limitations. Rather, the six-year limitations period applies. Mich. Comp. Laws § 600.5183 ("All other personal actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a different period is stated in the statutes."); *PCA Minerals, LLC v. Merit Energy Co., LLC*, 725 F. App'x 342, 347 (6th Cir. 2018) ("Michigan courts typically apply a gravamen analysis, that is, review the complaint in its entirety to determine the true nature

of the claims, and apply the statute of limitations governing the legal gravamen claim to equitable claims that seek analogous relief.") (citing *Taxpayers Allied for Constitutional Taxation v. Wayne County*, 450 Mich. 119, 537 N.W.2d 596, 600 n.9 (1995).

Unjust enrichment occurs when one party receives a benefit from another, and retention of that benefit causes some inequity. *Bellevue Ventures, Inc. v. Morang-Kelly Inv., Inc.*, 302 Mich. App. 59, 64, 836 N.W.2d 898, 901 (2013) (citing *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 546, 473 N.W.2d 652 (1991)). When unjust enrichment is proved, restitution is the remedy. *Wright v. Genesee County*, 504 Mich. 410, 418, 934 N.W.2d 805, 809 (2019).

There is no evidence that the plaintiff conferred a "benefit" upon the Bush defendants. In fact, the only "benefit" flowing to Bush was whatever he earned on his contract with the Township.

The personal-property-based claims are either untimely or unsupported. Counts VIII, IX, X, and XI will be dismissed.

### d. Infliction of Mental Distress

Cordts also alleges that Jack Bush behaved very badly during their encounter at the property on demolition day. That conduct, she says, supports the claims for intentional and negligent infliction of emotional distress against him found in Counts XIII and XIV of the complaint.

Although the Michigan Supreme Court has not yet recognized the tort of intentional infliction of emotional distress, the Michigan Court of Appeals has consistently accepted it. *Mroz v. Lee*, 5 F.3d 1016, 1018 (6th Cir. 1993) (collecting cases). To prove such a claim, the plaintiff must offer evidence that the conduct was "(1) extreme and outrageous conduct"; there was "(2) intent or recklessness" to "(3) caus[e]" (4) severe emotional distress." *Ruffin-Steinback v. dePasse,* 267 F.3d 457, 464 (6th Cir. 2001) (quoting *Andrews v. Prudential Secs., Inc.,* 160 F.3d 304, 309

(6th Cir. 1998)). "The outrageous conduct requirement is satisfied only by conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Liability arises, moreover, only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Andrews*, 160 F.3d at 309 (internal citations and quotations omitted).

Cordts says that Bush screamed profanities at her and Ms. Manley and chased her on her property, causing her to fall and sprain her ankle. Cordts also alleged that Bush told the plaintiff that he owned everything on her property and intentionally tore down the section of the plaintiff's home, which contained family pictures that the plaintiff specifically requested to retrieve, even though he was instructed to hold off on demolition until after the plaintiff returned from the Township Hall. The defendants dispute each allegation.

Insults alone will not support a claim for intentional infliction of emotional distress. However, the insults, coupled with chasing the women and deliberately destroying the only photographs of the plaintiff's deceased infant daughter could be seen as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Lucas v. Awaad*, 299 Mich. App. 345, 359, 830 N.W.2d 141, 149 (2013); *see Miller v. Currie*, 50 F.3d 373, 378 (6th Cir. 1995) (reversing dismissal of plaintiff's IIED claim against nursing home that "hid" her mother from her on visits); *Chesher v. Neyer*, 477 F.3d 784, 802 (6th Cir. 2007) (allowing IIED claim to go to jury where morgue used photographs of grieving family members in campaign literature).

The parties disagree about every relevant fact here. Bush denies swearing at and chasing the women and deliberately destroying her cherished photographs. The record also could be

developed better at trial on the degree that the plaintiff suffered severe emotional distress caused by the alleged conduct. The claim in Count XIII must be resolved at trial.

The *negligent* infliction of emotional distress claim does not fare as well. That claim requires proof that the plaintiff witnessed a serious injury threatened or inflicted upon someone with whom she had a close relationship, which caused "shock" "fairly contemporaneous[ly]" with the injury. *Hesse v. Ashland Oil*, *Inc.*, 466 Mich. 21, 34, 642 N.W.2d 330, 337 (2002). It requires more than simple proof that distress resulted from a defendant's alleged negligence. *Ibid.*

The record contains no such proof. In fact, the plaintiff's complaint merely restated the same allegations relied upon for her intentional infliction of emotional distress claim. She apparently did not apprehend that this cause of action is limited to bystanders who witness negligent injury to an immediate family member and suffer severe emotional distress as a result. The plaintiff did not allege that anyone was injured, let alone a family member, in the course of the contractor's work. The destruction of the precious photographs of her *deceased* daughter no doubt was upsetting, but that does not satisfy the elements of this claim. Count XIV will be dismissed.

### H. Claims Against Officer Duane Griffis

Officer Griffis maintains that he is shielded from the federal claims against him by qualified immunity and the state law claims by governmental immunity.

Griffis's only involvement in the events of this case, the reader might recall, was limited to responding to calls from the plaintiff and the contractor during the confrontation on August 20, 2015, when the demolition began. It was then that he contacted the Township office, learned that the property had been condemned and the house slated for demolition, and prevented Cordts from interfering with the contractor's work. In so doing, he refused to allow Cordts to enter the house

to retrieve keepsakes, although he attempted to negotiate a temporary suspension of demolition activity (which Bush did not honor) so Cordts could go to the Township office to seek some relief.

The plaintiff has named Officer Griffis in most of her federal claims: the due process, First Amendment, Fourth Amendment, and equal protection violations. Those claims are subject to the asserted qualified immunity defense.

Qualified immunity "shields government officials performing discretionary functions from civil liability for civil damages [when] their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Baynes v. Cleland*, 799 F.3d 600, 609 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008)). When the defense is raised in a summary judgment motion, the Court asks two questions: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation? These prongs need not be considered sequentially." *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010).

Cordts did not allege that Officer Griffis participated in any First Amendment retaliation in any way; that claim against him will be dismissed. Nor has she offered any evidence that Griffis did anything that remotely could constitute a Fourth Amendment violation. She invited him onto her property, she never said he seized any of her property, and he never arrested the plaintiff. That claim will be dismissed against Griffis as well.

To sustain the due process and equal protection claims against him, the plaintiff must show that it was objectively obvious that no reasonably competent officer would have concluded that his conduct was lawful. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who

-39-

knowingly violate the law"). The uncontested evidence does not support that conclusion. Instead, the record reflects that Officer Griffis acted as any reasonable officer would in the situation. After the plaintiff requested his presence, he took statements from multiple parties, then contacted the Township to determine the status of the property and whether defendant Bush was lawfully on the property. Once Officer Griffis determined that Huron Township went through the condemnation procedures and obtained a demolition order, he then informed the plaintiff and demanded that she stop interfering with the demolition or he would arrest her. The plaintiff acknowledged that Officer Griffis asked her seven or eight times to discontinue her protests. The plaintiff says that Griffis then grabbed her by the arm and instructed her for the last time that she must stop contesting the demolition. But that did not amount to a due process or equal protection violation.

Critically, Officer Griffis did everything he believed he had to do under his legal obligations. If Huron Township failed to notify the plaintiff adequately about the demolition, Griffis had no way to know about it. The only way he could have determined that Huron Township failed to provide due process would have been to second-guess the Township attorney he consulted. There is no authority remotely suggesting that Griffis was obliged to perform his own research into the condition of the property's title.

It is evident that by following orders and confirming his understanding with the township attorney, Officer Griffis did not violate any of the plaintiff's "clearly established" constitutional rights. *See JC Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir. 1994) (concluding that police officers who implemented an eviction at the direction of the building inspector were entitled to qualified immunity because requiring the police officers to second-guess the more informed judgment of a building safety inspector would hinder effective and swift action and that the police

officers should be afforded wide latitude to rely on a building safety officer's expertise where that expert determination appears to have some basis in fact).

Likewise, Griffis enjoys governmental immunity from the state law claims. He was an "officer" of a "governmental agency" acting "in the course of his employment." Mich. Comp. Laws § 691.1407(2). There are no facts in the record that could show that he was grossly negligent. Griffis' conduct was reasonable; he assessed the situation, took statements from the individuals involved, and contacted legal counsel to inquire about the validity of the demolition. He told the plaintiff to stay off the property only after he called Huron Township's attorney and confirmed that the city condemned the structure. The plaintiff's only allegation is that the officer did not double-check the city attorney's work and look into the plaintiff's title. Even if that behavior was negligent (which it was not), it certainly was not "so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a).

Griffis is entitled to summary judgment on all claims filed against him.

## III. Conclusion

Although neither side can prevail in full on the cross motions for summary judgment, the record shows that the defendants are entitled to dismissal of several of the plaintiff's claims because material facts are uncontested, and they may have judgment as a matter of law. The plaintiff is entitled to partial summary judgment of liability against the Township on one aspect of her Fourth Amendment claim. And several of the claims must be resolved at trial because the record discloses contested material fact disputes pertaining to them.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendants Huron Township and Duane Griffis (ECF No. 33) is **GRANTED IN PART AND DENIED IN PART**. Counts IV (First Amendment retaliation), VI (denial of equal protection of law), XII (negligence),

XIII (intentional infliction of emotional distress), XIV (negligent infliction of emotional distress), and XV (violation of Michigan's Headlee Amendment are **DISMISSED WITH PREJUDICE** as to defendant Huron Township. The complaint is **DISMISSED IN ITS ENTIRETY** against defendant Duane Griffis. The motion is **DENIED** in all other respects.

It is further **ORDERED** that the motion for summary judgment by defendants Bush & Son Grading & Excavating, Inc. and Jack Bush (ECF No. 35) is **GRANTED IN PART AND DENIED IN PART**. Counts III (due process violation), IV (First Amendment retaliation), V (Fourth Amendment violation), VI (denial of equal protection of law), VIII (trespass to chattels), IX (conversion), X (replevin and claim and delivery), XI (unjust enrichment), XII (negligence), and XIV (negligent infliction of emotional distress) are **DISMISSED WITH PREJUDICE** as to defendants Bush & Son Grading & Excavating, Inc. The motion is **DENIED** in all other respects.

It is further **ORDERED** that the plaintiff's motion for partial summary judgment (ECF No. 37) is **GRANTED IN PART AND DENIED IN PART**. The plaintiff has judgment in her favor on liability for that part of Count V of her complaint alleging a Fourth Amendment violation for pre-demolition activity. The motion is **DENIED** in all other respects.

It is further **ORDERED** that the Case Management and Scheduling Order is amended as follows: pretrial disclosures under Federal Rule of Civil Procedure 26(a)(3) must be filed on or before **March 23, 2020**, motions *in limine* must be filed by **April 4, 2020**, the proposed joint final pretrial order must be submitted to chambers on or before **May 15, 2020**, the final pretrial conference will be held on **May 26, 2020 at 3:30 p.m.**, and trial will begin on **June 2, 2020 at 8:30 a.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:  March 16, 2020

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on March 16, 2020.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI